# IN THE SUPREME COURT OF IOWA

No. 08–0430

Filed April 22, 2011

**DANIEL KING,**

Appellant,

vs.

**STATE OF IOWA,**

Appellee.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Linn County, Nancy A. Baumgartner, Judge.

On further review, appellant asserts the court of appeals erred in denying postconviction relief. **AFFIRMED.**

Wallace L. Taylor, Cedar Rapids, for appellant.

Thomas J. Miller, Attorney General, Bridget A. Chambers, Assistant Attorney General, Harold L. Denton, County Attorney, and Todd D. Tripp, Assistant County Attorney, for appellee.

**APPEL, Justice.**

The appellant, Daniel King, requests further review of the court of appeals' decision affirming his denial of postconviction relief. King argues his trial counsel was ineffective in not properly attacking DNA evidence offered by the State at trial. Upon our review of the record, we conclude that King has failed to show a reasonable probability that the verdict would have been different had trial counsel more adequately developed a response to the State's evidence. As a result, we affirm the decision of the district court denying King's application for postconviction relief.

## I.  Background Facts and Proceedings.

This is a postconviction relief action filed by Daniel King to vacate his conviction for sexual abuse in the third degree in violation of Iowa Code sections 709.4(2)(*c*)(4)[1] and 901A.2(3) (2003). The State alleges that on April 25, 2004, King, who was twenty-two years old at the time, had sex with a fifteen-year-old girl. The girl, A.A., alleged the nonconsensual sex took place in the front passenger seat of King's car between the hours of 2 and 4 a.m. There were no witnesses to the alleged event.

---

[1]Iowa Code section 709.4(2)(*c*)(4) provides:

> A person commits sexual abuse in the third degree when the person performs a sex act under any of the following circumstances:
>
> . . . .
>
> 2. The act is between persons who are not at the time cohabitating as husband and wife and if any of the following are true:
>
> . . . .
>
> *c.* The other person is fourteen or fifteen years of age and any of the following are true:
>
> . . . .
>
> (4)  The person is four or more years older than the other person.

Sometime during the afternoon of April 25, A.A. told her mother of the alleged incident. A.A.'s mother immediately called the police. Officer Mullen, from the Cedar Rapids Police Department, was dispatched to A.A.'s home. After being informed of A.A.'s sexual assault, Mullen requested the clothing A.A. had been wearing during the incident. A.A. informed Mullen that the clothing had not been washed and was lying in a pile on her bedroom floor. The clothing consisted of a pair of underwear, jeans, and a tank top. Mullen placed all three pieces of clothing in an unsealed paper bag. He then placed the unsealed bag in the trunk of his police car. The bag remained in the trunk of the police car until Mullen returned to the police department, where he delivered it to the department's evidence custodian. Upon delivery, it was placed in an evidence locker.

A.A. was taken to the emergency room where a nurse examined her and collected evidence for a sexual assault kit. Among other things, the nurse examining A.A. found large areas around the neck that looked like hickeys, purple bruising of both breasts, and a swollen rectum with tears. The nurse found these injuries consistent with sexual assault. The nurse also found abrasions in the vaginal area that suggested recent penetration.

On June 2, both the sexual assault kit and the paper bag containing A.A.'s clothing, along with buccal (DNA) swabs taken from King, were transported to the Iowa Division of Criminal Investigation (DCI) laboratory for examination. The technician who received the evidence testified that the paper bag containing A.A.'s clothing was not sealed when it arrived at the laboratory.

Before performing any tests, the DCI criminologist separated the three items of clothing and placed them in separate bags. The

criminologist then examined the underwear. The criminologist found seminal fluid on the crotch of the underwear that contained an epithelial cell with King's DNA.

The criminologist also examined some of the other items related to the case. The criminologist examined the vaginal slides of A.A.'s rape kit, finding seminal fluid with some sperm. The criminologist, however, was unable to develop a DNA profile from the sperm. The swabs taken from both sides of A.A.'s neck revealed King's DNA. Swabs were also taken from each of A.A.'s breasts. A DNA profile could not be developed from the left breast swab, but a DNA profile from the right breast swab excluded King from being the donor. No DNA or seminal fluid was found on the oral, rectal, or dental swabs. The criminologist did not review debris swabs from the genital area.

To aid in examining the State's DNA evidence, King's trial counsel hired a DNA expert, Professor David Soll. King's attorney sent Soll the following letter:

> I want to thank you for your willingness to review the D.C.I. Lab Report regarding the DNA findings and the State's discovery file against my client in this case.
>
> I have enclosed for your compensation, a trust check from my law firm made out to you in the amount of $1,000.00.
>
> Would you please contact me after you have reviewed the enclosed material with any opinions you may have regarding whether, or not, you can assist in Mr. King's defense?

The DCI laboratory report and the State's discovery file were sent along with this letter. A receipt detailing the evidence tested revealed that one of the exhibits was a paper bag containing the victim's underwear, jeans, and shirt worn the morning of the assault. The receipt

also indicates the bag was not sealed. The receipt was included in the file of materials sent by King's counsel to Soll.

Upon receipt of the materials, Soll "skimmed everything." He then proceeded to review the testing procedures used by the DCI. He determined that the laboratory used the correct methods for testing the DNA and its findings were accurate. King's attorney sent a letter to King and King's mother explaining Soll's conclusions.

Soll did not testify at King's trial. The jury found King guilty of sexual assault in the third degree. Because King had a prior conviction for assault with intent to commit sexual abuse, he was sentenced to an indeterminate term of twenty-five years in prison with an eighty-five percent mandatory minimum sentence. *See* Iowa Code § 901A.2(3).

After the trial, King's mother met with Soll "to see if there was anything that didn't seem right." She presented Soll with the DCI report that showed that the three articles of clothing were placed in the same bag. Based on the DCI report and his review of other documents, Soll developed a few "pretty extreme" concerns. After reviewing these materials, Soll became concerned that the DNA found on A.A.'s underwear could have been transferred to the underwear from either her shirt or jeans, as all of A.A.'s clothing had been placed in the same paper bag. He further noted that the lack of sperm in the seminal fluid suggested a "big possibility" of cross-contamination, which produced a "bigger probability" that King was not the source of the seminal fluid.

King's mother took notes of her conversation with Soll and relayed Soll's concerns to her son's attorney. In response, defense counsel filed a motion for a new trial and/or a motion in arrest of judgment. In this motion, counsel claimed King should be granted a new trial because the underwear on which the DCI laboratory found King's DNA was placed in

a bag with other clothing that may have cross-contaminated the underwear, making it an unreliable piece of evidence.

Attached to the motion was an affidavit by Soll. In this affidavit, Soll stated that, because the items of clothing that were worn by A.A. at the time of the alleged incident were placed together in a sack without being separated, there was an issue of cross-contamination. This raised doubts as to which article of clothing was the source of the DNA sample. Further, the seminal fluid in the underwear could not be matched to a particular person because there was no sperm in it. Additionally, there was no sperm in the vaginal slides to make an identification of the donor.

The district court denied the motion on the basis that the evidence could have been discovered previously and presented at trial. King appealed. On appeal, his counsel determined that any ineffective-assistance-of-counsel claim he might have could not be decided on direct appeal, but only in a postconviction relief action in which a record could be more fully developed. As a result, appellate counsel filed a motion to dismiss the appeal as frivolous, which this court granted.

This postconviction action was filed pro se by King in December 2006. An amended application was later filed by King's attorney. In the amended application, King claimed that his trial counsel was ineffective for failing to raise the issue of DNA cross-contamination at trial, failing to present additional testimony that contradicted A.A.'s testimony, and failing to present evidence of A.A.'s possible motives for accusing King of rape.

The district court denied King's application. The district court stated that it was Soll who failed to notice a possible cross-contamination problem with the evidence and that error could not be attributed to defense counsel. The district court further found that the failure to offer

testimony from additional witnesses did not rise to ineffective assistance of counsel.

King appealed the district court's decision, and his appeal was routed to the court of appeals. The court of appeals affirmed the district court. King filed an application for further review with this court, which we granted.

**II. Scope of Review.**

We review claims of ineffective assistance of counsel de novo. *State v. Lyman*, 776 N.W.2d 865, 877 (Iowa 2010). In conducting our de novo review, "we give weight to the lower court's findings concerning witness credibility." *Ledezma v. State*, 626 N.W.2d 134, 141 (Iowa 2001).

**III. Discussion and Analysis.**

**A. State vs. Federal Constitution.** In this postconviction relief action, King presents an ineffective-assistance-of-counsel claim. He does not, however, indicate whether the case has been brought under the Sixth Amendment to the United States Constitution or article I, section 10 of the Iowa Constitution. When there are parallel constitutional provisions in the federal and state constitutions and a party does not indicate the specific constitutional basis, we regard both federal and state constitutional claims as preserved, but consider the substantive standards under the Iowa Constitution to be the same as those developed by the United States Supreme Court under the Federal Constitution. *State v. Wilkes*, 756 N.W.2d 838, 842 n.1 (Iowa 2008). Even in these cases in which no substantive distinction had been made between state and federal constitutional provisions, we reserve the right to apply the principles differently under the state constitution compared to its federal counterpart. *State v. Bruegger*, 773 N.W.2d 862, 883 (Iowa 2009).

**B. Framework for Evaluation of Claims of Ineffective Assistance of Counsel.** To establish an ineffective-assistance-of-counsel claim under the Federal Constitution, an applicant must demonstrate that " '(1) his trial counsel failed to perform an essential duty, and (2) this failure resulted in prejudice.' " *State v. Ortiz*, 789 N.W.2d 761, 764 (Iowa 2010) (quoting *State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006)); *see Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L. Ed. 2d 674, 693 (1984). The applicant must prove both elements by a preponderance of the evidence. *Ledezma*, 626 N.W.2d at 142.

To prove the first prong of the *Strickland* test, the claimant must demonstrate that the attorney's performance fell below the "standard demanded of a reasonably competent attorney." *Id.* We measure the attorney's performance against the " 'prevailing professional norms.' " *Id.* (quoting *Strickland*, 466 U.S. at 688, 104 S. Ct. at 2065, 80 L. Ed. 2d at 694). In evaluating the performance of counsel, we presume the attorney performed competently, and it is the applicant's burden to present facts establishing inadequate representation. *Millam v. State*, 745 N.W.2d 719, 721 (Iowa 2008). "Miscalculated trial strategies and mere mistakes in judgment normally do not rise to the level of ineffective assistance of counsel." *Ledezma*, 626 N.W.2d at 143. However, "strategic decisions made after a 'less than complete investigation' must be based on reasonable professional judgments which support the particular level of investigation conducted." *Id.* (quoting *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066, 80 L. Ed. 2d at 695). The "investigation must be reasonable under the circumstances"; therefore, we look to the facts of the case to determine whether there was a lack of diligence. *Id.*

Even when attorneys accept cases "in an area in which they are unfamiliar, they bear the responsibility to perform the work competently.

No client should be made to suffer through an attorney's learning curve." *Comm. on Prof'l Ethics & Conduct v. Pracht,* 505 N.W.2d 196, 198 (Iowa 1993). A reasonable investigation has been described as "a thorough study of as much literature in a particular field as [the attorney] can possibly absorb in the time allotted." Harry A. Gair, *Selecting and Preparing Expert Witnesses, in* 2 Am. Jur. Trials 585, 635 (1964). It is also suggested that an attorney with no experience in the particular field of the case should read at least one quality book on the subject. *Id.*

In order to meet the second prong of the *Strickland* test, an applicant must show that there is a reasonable probability that the result would have been different. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698. The likelihood of a different result need not be more probable than not, but it must be substantial, not just conceivable. *Id.* at 693–94, 104 S. Ct. at 2067–68, 80 L. Ed. 2d at 697–98.

**C. Ineffective Assistance for Failure to Develop DNA Defense.** In this case, King's counsel recognized that DNA would play a major role in the case. King's counsel, however, did not have much experience with DNA issues. As a result, he hired Soll to provide him with expert assistance in the case.

As he was preparing for trial, King's counsel sent a letter asking Soll to look at the DNA evidence and determine "whether or not [Soll] could assist in Mr. King's defense." King's counsel sent Soll a file containing materials that indicated A.A.'s shirt, pants, and underwear were placed in the same evidence bag the day after the incident. Despite this, King's counsel did not direct Soll's attention to the issue of cross-contamination.

Soll apparently interpreted counsel's request narrowly as one to "review the technology of the Des Moines crime lab that was doing the DNA analysis" to see if the results were correct. Essentially, Soll thought he was simply to determine whether the DNA found on A.A.'s clothing really belonged to King. Soll claimed it was not his job to put the DNA results into context. Prior to King's trial, he did not identify any issue related to cross-contamination and thus did not consider whether the potential of cross-contamination would have any impact on the State's case.

After trial, Soll connected the dots. He realized that, because the DNA in the seminal fluid came from epithelial cells and not sperm cells, there was a "high probability" that the DNA found in the seminal fluid had migrated from another piece of clothing that was in the bag or from some other kind of contamination. Further, Soll recognized that, because the seminal fluid in the underwear did not contain sperm, which is relatively hardy and long lasting, there was a "bigger probability" that the seminal fluid in the crotch of the underwear was not King's.

Thus, Soll now concluded that the powerful and seemingly irrefutable evidence at trial that the seminal fluid found in the crotch of the underwear contained the DNA of King could have been substantially undermined in two ways. First, the epithelial cell containing King's DNA could have been transferred to the underwear from one of the other articles of clothing. Second, the seminal fluid in the underwear was probably not King's because of the lack of sperm. If Soll's newly developed opinions had been presented to the jury, it could have concluded that, while King had some kind of contact with A.A., the contact could have been a result of conduct other than sexual intercourse.

When an attorney hires an expert to assist in the defense, effective counsel cannot simply present the file to the expert and ask for an opinion. Instead, the effective attorney must engage in a two-stage process. First, the attorney must develop a basic working knowledge of the subject matter about which the expert is consulted. *See Richey v. Bradshaw*, 498 F.3d 344, 362–63 (6th Cir. 2007). Second, the attorney must then consult with the expert and competently explore the potential issues. The mere hiring of an expert is meaningless "if counsel does not consult with that expert to make an informed decision about whether a particular defense is viable." *Id.* at 362. The question in this case is whether King's counsel engaged in this two-stage process.

In this case, King's attorney appears not to have remembered the O.J. Simpson trial in which issues of contamination of apparently highly incriminating DNA evidence were at the heart of the defense attack. *See, e.g.*, William C. Thompson, *DNA Evidence in the O.J. Simpson Trial*, 67 U. Colo. L. Rev. 827 (1996) (reviewing various cross-contamination issues). Further, King's attorney apparently did not acquaint himself with the literature regarding DNA testing. Had he done so, he would have recognized the need to explore potential contamination theories to attack harmful evidence. *See, e.g.*, Comm. on DNA Forensic Sci., Nat'l Research Council, *The Evaluation of Forensic DNA Evidence* 80, 83–84 (1996) (noting concern with sample mishandling and further observing that sperm DNA can be separated from nonsperm DNA with differential DNA extraction); Comm. on DNA Tech. in Forensic Sci., Nat'l Research Council, *DNA Technology in Forensic Science* 20, 66 (1992) (noting contamination can result from the handling of other evidence samples and from mixed samples and noting that forensic investigators should take care to minimize the risk of contamination); Edward J. Imwinkelried

& D.H. Kaye, *DNA Typing: Emerging or Neglected Issues*, 76 Wash. L. Rev. 413, 473 (2001) (discussing cross-contamination in collecting and handling of DNA evidence); Michael R. Flaherty, Annotation, *Admissibility, in Prosecution for Sex-Related Offense, of Results of Tests on Semen or Seminal Fluids*, 75 A.L.R.4th 897, 910 (1989) (stating "expert examination of a sample to check for contamination . . . may be useful to call into question the reliability of the results"); William C. Thompson et al., *Evaluating Forensic DNA Evidence: Essential Elements of a Competent Defense Review*, The Champion 16 (April 2003), *available at* http://www.bioforensics.com/articles/champion1/champion1.html (discussing the steps defense lawyers must take to adequately evaluate DNA evidence offered against their clients). Further, an examination of DNA case law would have revealed the potential for attack based upon cross-contamination of DNA evidence. *See, e.g., United States v. Lowe*, 954 F. Supp. 401, 419 (D. Mass. 1996) (noting cross-contamination due to handling before, during, or after DNA extraction); *State v. Wommack*, 770 So. 2d 365, 372 (La. Ct. App. 2000) (raising possible cross-contamination where clothing bagged together); *Mincey v. State*, 112 S.W.3d 748, 750, 753 (Tex. Ct. App. 2003) (noting possibility of cross-contamination when clothing put in same paper bag). Thus, a reasonably competent lawyer would have determined that a threshold question in DNA cases is whether there has been contamination of the evidence.

If King's counsel had reviewed the literature and been aware of the potential of cross-contamination, however, it is possible that King's trial counsel still would not have understood the significance of the evidence in this case. A transfer of seminal fluid containing his client's DNA from one piece of clothing onto another might not be very helpful. For

example, to suggest that his seminal fluid containing DNA was originally on A.A.'s shirt and then migrated to the crotch of the underwear due to improper handling or when jostled around in the same paper bag not only seems improbable, but would not be all that helpful to the defense. A defense concession that seminal fluid containing King's DNA was deposited on the shirt or jeans of the victim would not necessarily suggest that no sex act occurred between King and A.A.

The issue, however, is more substantial. Not only was there the possibility that the DNA had migrated into the crotch of the underwear from other sources, it was also possible that the DNA was not linked at all to the seminal fluid in the crotch. This is the kind of scientific knowledge that only an expert would likely bring to the table in a criminal defense.

The question in this case boils down to this: Under the circumstances, was King's counsel ineffective for failing to bring the facts of cross-contamination to the attention of the expert and to explore potential challenges to the sample-gathering process to show the evidence did not necessarily establish that the seminal fluid in the underwear belonged to King? On the one hand, counsel is not required to know all the ins and outs of technical subject matter. One of the functions of an expert is to identify, define, and refine potential issues. *Coleman v. Calderon,* 150 F.3d 1105, 1114–15 (9th Cir.), *rev'd on other grounds,* 525 U.S. 141, 119 S. Ct. 500, 142 L. Ed. 2d 521 (1998); *Hendricks v. Calderon,* 70 F.3d 1032, 1038–39 (9th Cir. 1995). In this regard, it is noteworthy that King's counsel did provide Soll with the discovery file in the case. The discovery file included the police reports describing that the three articles of clothing were placed in one bag. As emphasized by the district court, a careful examination of the entire file

by Soll would have revealed the potential for cross-contamination. On the other hand, it is clear that, if King's counsel had simply directed Soll's attention to the facts like King's mother did after King's conviction, the evidence would likely have been fully developed. An attorney has an obligation to diligently and competently determine whether, given the circumstances of a particular case, there are issues "worth raising." *Millam*, 745 N.W.2d at 723. Because of his lack of knowledge or inattention to the file, the cross-contamination issue was not explored with Soll by King's counsel prior to trial.

In this case, however, it is not necessary to decide the issue of whether King's counsel provided inadequate assistance because, upon our review of the entire record, we conclude that King has failed to show prejudice as required under the *Strickland* test. Under *Strickland*, the question is whether there is a "reasonable probability" that the result would have been different. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698. Stated in other terms, the question is whether our confidence in the verdict is undermined by the failure to present a fuller picture of the DNA evidence. *Id.*; *State v. Graves*, 668 N.W.2d 860, 882 (Iowa 2003).

The victim in this case testified that King sexually assaulted her. She testified that the assault occurred in King's car between 2 and 4 a.m. At 4:45 a.m., the victim reappears at a convenience store with visible hickey-like bruises on her neck. There was also unrebutted medical evidence that the victim suffered bruised breasts and rectal tears, indicating that a sexual assault did, in fact, occur. The victim's identification of King as the perpetrator was supported by the presence of King's DNA on both sides of her neck. While King did not take the stand, his interview with the police was remarkable for its inconsistency. At

first, he denied knowing the victim when presented a photograph of her. Then he admitted that he knew the victim but claimed he did nothing improper. Next, when told that the victim was accusing him of sexual assault, King made the remarkable claim that the victim was falsely accusing him of sexual assault in response to his claim that she broke the windshield of his car.

Further, the new DNA evidence offered by King, though helpful in discrediting some aspects of the State's DNA evidence, does not undermine our confidence in the verdict. Based on an experiment Soll candidly admits was not as accurate or extensive as it could have been, Soll is prepared to testify that the DNA in the crotch of the underwear could have migrated from other articles of clothing or been the result of other contamination, but he cannot exclude the possibility that such contamination did not, in fact, occur. Also, Soll's theory is dependent upon the presence of King's DNA on the other articles of clothing bagged with the victim's underwear. The other articles of clothing that were in the paper bag were not tested by Soll or anyone else. Therefore, it is not at all clear that cross-contamination occurred.

Similarly, Soll suggested that the lack of sperm in the crotch of the underwear indicated that the seminal fluid may have been old. Soll, however, did not himself perform any testing on the underwear to confirm the lack of sperm. Further, even if there were no sperm in the seminal fluid and the seminal fluid was not a result of sexual activity on the night in question, these facts would not have diverted suspicion away from King as the assailant on the night of the attack.

Soll also confidently asserted that, if he had examined the sperm in the vaginal swab, he would likely have been able to find identifiable DNA. Yet, he did not perform further testing on the sample. This was

likely a tactical decision, as King had admitted to counsel that he had engaged in unprotected intercourse with A.A. The failure to perform further tests on the vaginal swab material, and indeed on any of the samples, makes King's postconviction relief claim less compelling.

Soll offered potential theories that undermined some aspects of the State's evidence, but he would have left the jury to speculate whether his theories were, in fact, correct. Also, the lack of identifiable sperm or seminal fluid is not determinative of King's guilt. Indeed, even assuming that Soll's revised opinion would have tended to discredit the testimony regarding DNA in the victim's underwear, the presence of King's DNA on the victim's neck in the vicinity of hickey-like bruises suggests precursor activity consistent with the victim's allegation that King engaged in sexual intercourse with her. Further, Soll's testimony will not challenge the evidence of physical injuries that strongly indicates that a sexual assault in fact occurred or that King's story to the police evolved from a claim not to know the victim into a charge that the victim smashed his windshield on the night of the alleged incident.[2] *See Harrington v. Richter,* 562 U.S. ___, ___, 131 S. Ct. 770, 792, 178 L. Ed. 2d 624, 647 (2011) (concluding the defendant failed to show prejudice in part because new expert evidence offered in the posttrial proceeding did not challenge other conclusions and evidence presented by the State at trial, including the defendant's shifting story regarding his involvement in the crime).

---

[2]Interestingly, King offered evidence at the postconviction relief hearing that tended to further incriminate him. A party-goer, Dan Freese, testified that King and the victim left the apartment together in the early morning hours and that, upon return, the victim announced that she and King had sex. King was only charged with consensual sex under Iowa Code section 709.4(2)(*c*)(4). Therefore, Freese's testimony tended to further incriminate King.

In light of the entire facts and circumstances, we conclude that King has failed to demonstrate a reasonable probability under *Strickland* that the verdict would have been different in this case if the defense had presented the evidence developed in the posttrial hearing related to DNA.[3]

**D. Failure to Present Additional Testimony and Evidence of Motive.** King also asserts that his trial counsel was ineffective for failing to elicit testimony from several witnesses at the party A.A. and King attended prior to the alleged assault. According to King, these witnesses would testify that several other men at the party touched A.A.'s breasts. He also claims they heard A.A. announce that she and King had consensual sex.[4] As we and the district court previously noted, the sole issue in this case is whether King and the victim had sex.

Under these circumstances, we find it impossible to believe that testimony indicating others had touched the breasts of a fifteen-year-old girl who just announced she had sex with King would have changed the jury's verdict. King, therefore, has not shown a substantial probability that a different outcome would have resulted had the additional evidence been offered. Indeed, as pointed out by the district court, such evidence, far from exculpating King, would have reinforced his guilt of sexual assault in the third degree, which only requires a sex act between a fourteen or fifteen year old and a person four or more years older than the teenager. *See* Iowa Code § 709.4(2)(*c*)(4).

---

[3]We reach our result under the Sixth Amendment of the United States Constitution and independently under article I, section 10 of the Iowa Constitution.

[4]By the time of trial, one of these witnesses had left the country unbeknownst to King's trial counsel.

King also suggests that his counsel provided ineffective assistance because he failed to call a witness who would have testified that A.A. made a previous false report of rape. While King offers evidence that the witness would have so testified, there has been no showing that the claim was false. As a result, the statement would not be admissible under Iowa law, *State v. Alberts*, 722 N.W.2d 402, 409 (Iowa 2006), and the claim of ineffective assistance necessarily fails.

Finally, counsel was not ineffective for failing to present evidence of A.A.'s possible motives for making a false claim of sexual assault. King asserts trial counsel should have asked the victim about her request for her family members to be reimbursed for lost wages in connection with the case. He also claims A.A. may have made up the sexual assault to avoid paying damages for allegedly vandalizing his car on the evening in question. Evidence related to the alleged vandalization of the car did come into the record through the testimony of a police officer who interviewed King, and thus the failure to present additional evidence does not present a strong ineffective-assistance claim. Even if counsel's failure to present evidence of A.A.'s possible motives for accusing King constituted ineffective assistance of counsel, it is hard to see how these relatively minor issues had a reasonable probability of affecting the outcome of this case. Our confidence in the outcome has not been undermined by these alleged shortcomings of King's counsel as required by *Strickland*.

## IV. Conclusion.

King has failed to meet the prejudice prong of *Strickland*. As a result, the district court properly denied King's application for postconviction relief.

**AFFIRMED.**

All justices concur except Mansfield, J., who takes no part.