# IN THE COURT OF APPEALS OF IOWA

No. 18-2001
Filed August 5, 2020

**WARREN PURVIS,**
        Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
        Respondent-Appellee.
_____

Appeal from the Iowa District Court for Cerro Gordo County, Colleen Weiland, Judge.

Warren Purvis appeals the dismissal his petition for postconviction relief. **AFFIRMED.**

Travis M. Armbrust of Brown, Kinsey, Funkhouser & Lander, P.L.C., Mason City, for appellant.

Thomas J. Miller, Attorney General, and Kyle Hanson, Assistant Attorney General, for appellee State.

Considered by Vaitheswaran, P.J., and Doyle and May, JJ.

**MAY, Judge.**

Warren Purvis appeals the dismissal of his application for postconviction relief. We affirm.

**I. Background**

A jury convicted Purvis of sexual abuse in the first degree, a class "A" felony; willful injury resulting in serious injury, a class "C" felony; and domestic abuse assault impeding breathing or circulation of blood resulting in injury, a class "D" felony. He was sentenced to life imprisonment.

Purvis appealed. This court affirmed. *State v. Purvis*, No. 13-0794, 2014 WL 3511795, at *1 (Iowa Ct. App. July 16, 2014). Our opinion included this factual summary:

> On December 23, 2012, [the victim] and Purvis were in an intimate relationship and living together in [the victim]'s home. At some point in the evening, [the victim] posted a message on Facebook, stating, "Anyone, please call police and have them come to [the victim's address]. Please help me now." One of [the victim]'s friends called the police, and the police officers then proceeded to the address for a welfare check.
>     The police arrived to [the victim]'s home at approximately 6 p.m. Purvis answered the door when the police officers knocked. The officers testified they heard a faint female cry for help upon entering the residence. They found [the victim] in the back bedroom, lying in bed. She had bruises and marks on her face and chest. [The victim] told one of the officers Purvis had physically and sexually assaulted her. She said Purvis had strangled her and bit her. She told officers she thought she had lost consciousness twice. The police called the paramedics, who then transported [the victim] to the hospital in the ambulance.
>     As one of the officers talked with [the victim] in the bedroom, another talked with Purvis in the living room. The officer did not advise Purvis of his *Miranda* rights. Purvis was not placed in restraints or told he was under arrest. Purvis sat on the living room couch as he talked with Officer Eernisse. They spoke for approximately ten minutes before a taking a short break. Purvis and Officer Eernisse then spoke for approximately thirty minutes more. Purvis admitted to Officer Eernisse that he fought with [the victim]

and that he slapped her a couple times. Purvis told the officer he and [the victim] had consensual sex even though they had been fighting. During the questioning, Purvis told the officer he had taken twenty Lortab pills because he wanted to kill himself. The officers called an ambulance, and Purvis was transported to the hospital.

Purvis was examined at the hospital at approximately 7:20 p.m. by Dr. Singh. The doctor noted Purvis was drowsy, but that he could talk and was capable of being alert. He was able to answer the doctor's questions. Dr. Singh noted a "very minimal" odor of alcohol emanating from Purvis. Lab results showed his blood alcohol content was .073 and urine drug screen results showed he had opiates in his system. Dr. Singh testified the opiates would make a person drowsy. Purvis was released from the hospital at approximately 10:50 p.m.

After Purvis was discharged from the hospital, he was transported to the police station. Purvis was placed in an interview room and given water. He was not handcuffed or restrained. Purvis was read his *Miranda* rights and asked if he understood them. He acknowledged that he did. He was then told to read the waiver form, which listed the *Miranda* warnings and stated:

> **I have read this statement and understand my rights.** I am willing to make a statement and answer questions. I do not want to consult an attorney or have one present at this time. I understand I may decide at anytime to exercise these rights and decline to answer any further questions or make a statement.

Purvis signed and dated the form before talking with the officers.

Purvis was able to provide Officers Hugi and Kemna with biographical information, but he originally told officers he could not remember the events of the day. The officers continued talking to Purvis for approximately forty minutes. The officers then left Purvis in the interview room and "gave him a break." Officer Eernisse, who had talked to Purvis in the home, then joined the other three in the interview room. Officer Eernisse reminded Purvis what he said during their discussion in the home. Purvis admitted he forced [the victim] to have sex with him after he physically assaulted her. The interview lasted for approximately thirty minutes. Purvis then agreed to provide a written statement, and the officers left the room.

Purvis filled out a cover form, which stated "This statement is freely and voluntarily given without promises, threats or coercion . . . ," and signed his name. He handwrote a statement, which read, in part:

> So I grabbed her by the throat and hit her several times. She grabbed my necklace and tore it off of me. So I bit her nose then she bit my arm so then I leaned on her throat with my forearm. Then I hit her in the chest

about 3 or 4 times. Then hit her in the face a few times. Then made her have sex with me. After that I told her that I wanted to die. She said that she wanted to also. She took some pills and dumped the rest into my hand. I went to the fridge and got 2 beers and sat down on the floor. She called into work sick. Then I fell asleep, when I woke up I told her that the pills weren't working. She said, "Take some of the Codine." So I did. Then I fell asleep again. When I woke up, the police were knocking on the door. I regret doing that!

On January 4, 2013, Purvis was charged with first-degree sexual abuse, willful injury resulting in serious injury, and domestic abuse assault impeding breathing or circulation of blood causing bodily injury.

. . . .

A jury trial was held on the matter on April 2–5, 2013. [The victim] testified at trial that Purvis physically and sexually assaulted her. She also testified about her resulting injuries and ongoing medical complications, namely dizziness, posttraumatic stress disorder (PTSD), limited use of one of her hands, and partial loss of hearing in one ear. Medical personnel who treated [the victim] on the night of December 23 also testified about the sexual assault examination which revealed skin irritation around [the victim]'s vagina and an abrasion on her labia. A CT scan showed, among other things, a broken nose and subarachnoid hemorrhaging, also known as a brain bleed. [The victim]'s injuries required her to spend two days in the intensive care unit.

Id. at *1–3.

For reasons that will be discussed below, we mention three additional pieces of background. First, during jury selection, one potential juror—who we identify as Juror P—acknowledged knowing the victim because he "drove stock car for her dad years ago." Counsel then asked Juror P: "Do you think that would affect your ability to listen to the facts and evidence in the case where she's a victim?" Juror P responded, "No." Counsel followed up by asking: "You still feel that you could be fair and impartial?" Juror P. answered in the affirmative. Ultimately, Juror P served on the jury that convicted Purvis.

Second, the State called Kristen Evans, a criminologist who works at the Iowa Division of Criminal Investigation Criminalistics Laboratory. Evans testified that she had analyzed a buccal swab from Purvis and a sexual assault kit from the victim. The kit included oral, vaginal, anal, and inner-thigh swabs. Evens testified (1) all of the victim's swabs screened negative for seminal fluid; (2) she found no spermatozoa in the victim's swabs; and (3) she found no indication of male DNA on any of the victim's swabs.

Finally, Purvis testified at trial. He told the jury he had consensual sexual contact with the victim in the shower. He claimed she "backed up to [him] and [his] penis went between her legs." Purvis also testified that, following the shower, they had consensual sex in the bedroom. But he only put his penis "partway in" and stopped before ejaculating, he claimed. He admitted that, hours later, he "got mad and beat her up." But he denied forcing her to have sex with him.

As noted, the jury ultimately found Purvis guilty as charged. Following his unsuccessful direct appeal, Purvis filed this postconviction-relief case. Purvis claims his trial counsel was ineffective. The district court concluded otherwise and dismissed Purvis's application. This appeal follows.

## II. Standard of Review

"We review claims of ineffective assistance of counsel de novo." *King v. State*, 797 N.W.2d 565, 570 (Iowa 2011). "In conducting our de novo review, 'we give weight to the lower court's findings concerning witness credibility.'" *Id.* at 571 (citation omitted).

"To establish [a] claim of ineffective assistance of counsel," the claimant must show their "trial counsel failed to perform an essential duty and counsel's

failure resulted in constitutional prejudice." *State v. Walker*, 935 N.W.2d 874, 881 (Iowa 2019). "The claimant must prove both elements by a preponderance of the evidence." *State v. Madsen*, 813 N.W.2d 714, 724 (Iowa 2012).

To establish breach of an essential duty, the claimant must prove counsel "perform[ed] below the standard demanded of a reasonably competent attorney." *State v. Haas*, 930 N.W.2d 699, 703 (Iowa 2019) (citation omitted). "In analyzing the [claimant]'s claims, we 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . .'" *Id.* (citation omitted). So the claimant "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (citation omitted).

"To establish constitutional prejudice, the defendant is required to show 'that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Walker*, 935 N.W.2d at 881 (citation omitted). "It is not enough for the defendant to show that the errors had [only] some . . . effect on the outcome of the proceeding." *Id.* (alteration and omission in original) (citation omitted). "Rather, '[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (alteration in original) (citation omitted).[1]

---

[1] Purvis suggests Iowa should adopt different standards for prejudice. But the standards explained above come directly from our supreme court. Any changes to those standards may not come from this intermediate court of appeals. *See, e.g.*, *State v. Hodges*, No. 17-0712, 2018 WL 1433833, at *3 n.3 (Iowa Ct. App. Mar. 21, 2018) ("As an intermediate court of appeals, we are not at liberty to overrule controlling supreme court precedent.").

When the applicant fails to show constitutional prejudice, it is not necessary for the court to decide whether counsel breached a duty. *See id.*; *King*, 797 N.W.2d at 574 ("In this case, however, it is not necessary to decide the issue of whether King's counsel provided inadequate assistance because, upon our review of the entire record, we conclude that King has failed to show prejudice as required under the *Strickland* test.").

## III. Analysis

Purvis raises two ineffective-assistance claims. First, Purvis claims counsel was ineffective in failing to obtain a DNA expert to provide testimony or at least help with trial preparation. "A reasonably competent attorney," Purvis argues, "would understand the importance of DNA evidence and the need to confront the State's handling of the evidence and the conclusions being made."

We disagree. The State's DNA expert, Evans, testified to finding no seminal fluid, no spermatozoa and, indeed, no male DNA in the victim's swabs. A reasonably competent attorney could see no need to "confront" Evans, whose testimony can be reasonably described as favorable to Purvis.

But Purvis emphasizes that expert assistance might have led to more and better expert testimony concerning epithelial (skin) cells, which can be exchanged during a sexual encounter. As the PCR court noted, though, there was no real question as to whether there was a sexual encounter: Purvis testified that there was. The central question was whether the sex was consensual. And based on our de novo review of the record, we agree with the State that the presence or absence of skin cells would not have shown whether a sexual encounter was consensual or not. Moreover, even if additional evidence about skin cells might

have shed *some* light on the consent issue, it could not have shed *enough favorable light* to outweigh the overwhelming evidence of nonconsensual sex, including Purvis's own written confession that he had "made her have sex with [him]."[2]  Put differently, Purvis has shown no "reasonable probability that . . . the result of the proceeding would have been different."  *Walker*, 935 N.W.2d at 881 (citation omitted).  So Purvis cannot prevail on this claim.

For his second and final claim, Purvis argues counsel was ineffective for failing to use a strike to remove Juror P.  *See* Iowa R. Crim. P. 2.18(9).  We think the PCR court properly analyzed this issue:

> The transcript reveals that the juror "drove stock car for [the victim's] dad years ago."  He knew the family well enough to recognize the victim by a nickname, but he also verified that his ability to listen to facts and evidence and to be fair and impartial would not be affected by this relationship.  Purvis'[s] argument that this juror's presence on the jury prejudiced him is entirely speculative.  [Trial counsel's] testimony and the evidence makes clear that the many moving parts of selecting peremptory strikes were considered by [trial counsel].  Neither prong of ineffective assistance of counsel is proven.

Like the PCR court, we reject Purvis's claim regarding Juror P.

---

[2] In the criminal trial, Purvis's written statement was admitted as Exhibit 15.  Here is an excerpt:

the one she wanted and loved, So I grabbed her by the throat and hit her several times, she grabbed my necklace and tore it off of me, so I ~~let~~ bit her nose. then she bit my arm so then I leaned on her throat with my forarm. Then I hit her in the chest about 3 or 4 times, Then hit her in the face a ~~few~~ few times, Then made her have sex ~~with~~ with me. 'After

**IV. Conclusion**

Purvis has failed to prove that "trial counsel failed to perform an essential duty" or that Purvis suffered "constitutional prejudice." *Walker*, 935 N.W.2d at 881. The PCR court was right to dismiss Purvis's application.

**AFFIRMED.**