# IN THE COURT OF APPEALS OF IOWA

————————————

No. 24-1298
Filed January 7, 2026

————————————

**Leroy Daniel Kula Jr.,**
Applicant–Appellant,

v.

**State of Iowa,**
Respondent–Appellee.

————————————

Appeal from the Iowa District Court for Fayette County,
The Honorable John J. Sullivan, Judge.

————————————

**AFFIRMED**

————————————

Steven J. Drahozal, Assistant Public Defender-Wrongful Convictions Unit,
attorney for appellant.

Brenna Bird, Attorney General, and Louis S. Sloven, Assistant Attorney
General, attorneys for appellee.

————————————

Considered without oral argument
by Tabor, C.J., and Greer and Buller, JJ.
Opinion by Greer, J.

**GREER, Judge.**

Leroy Kula appeals from the district court's order denying his application for postconviction relief (PCR). His challenge is directed at both trial counsel and PCR counsel. First, Kula argues trial counsel was ineffective when counsel engaged in incompetent cross-examinations, inadequately investigated potential defense witnesses, and failed to object to the admission of child-protection-center (CPC) interview recordings as exhibits. Second, Kula argues his PCR counsel was ineffective in failing to raise the issue of cumulative error by trial counsel and in failing to raise a challenge to trial counsel's failure to challenge the CPC-interview exhibits. Like the PCR court, we reject Kula's claims, finding that he failed to prove ineffective assistance of counsel or prejudice. We affirm.

## I. Background Facts and Proceedings.

Kula was charged via amended trial information with two counts of sexual abuse in the second degree (counts I and II) and two counts of sexual exploitation of a minor (counts III and IV) based on acts occurring during 2014. Waiving his right to a jury trial, Kula's case was tried before the bench. Following his trial, the district court found Kula guilty as charged. Kula was sentenced to twenty-five years each on counts I and II, to be served consecutively, and ten years each on counts III and IV, to be served concurrently but consecutively with counts I and II. After sentencing, Kula appealed his convictions and sentences, arguing the district court abused its discretion in admitting evidence of prior bad acts and considering improper sentencing factors. We affirmed Kula's convictions and sentences. *State v. Kula*, No. 16-0737, 2017 WL 3283285, at *8 (Iowa Ct. App. Aug. 2, 2017).

In our opinion on direct appeal, we summarized the facts leading to Kula's conviction:

Kula is thirty-five years of age. He married his wife, Suzette, in 2007, but they have been separated since April of 2011. She lives in Grinnell with her three children, including J.K. (born 2008) and S.K. (born 2010). After their separation in 2011, both Kula and Suzette lived in Grinnell and shared care of the children. In January 2014 Kula moved to Arlington with his fourteen-year-old son from a prior relationship. Suzette assumed primary care of J.K. and S.K., and Kula had visits on alternating weekends and extended time during the summer. Suzette had surgery in June of 2014 and was unable to care for the children. J.K. and S.K. stayed with Kula in Arlington for two weeks. When they returned to their mother, they were very emotional and acting strangely. They were both crying for unknown reasons, wetting their pants and reluctant to go on visits with Kula. They were also acting out sexual behavior with Barbie dolls. Their behaviors continued into the fall of 2014.

When staying with Kula, J.K. shared a bedroom with S.K. [Kula's teenage son] E.K. and Kula had their own room. During visits, J.K. and S.K. would play with their friends, L.R. and her sister, M.M. L.R. (born 2008), lives in Arlington with her dad, brother and sister. She is in second grade. She knows Kula because she used to go to his house with her dad and siblings. When she visited the Kula home, Kula let her try on different clothes. He had different swimsuits for her to wear, and she changed in and out of those suits in J.K.'s bedroom. She was not allowed to keep the clothes. L.R. often spent the night at Kula's house. She slept in J.K. and S.K.'s bedroom but also slept with Kula in his bed beside him. L.R. testified, "[H]e [Kula] had sex with me." She said it happened in the middle of the night in his bedroom while the other children were sleeping. She did not know what "have sex means" but remembered that Kula was naked and she had no shirt on but had pants on. She is unable to specifically remember what happened.

On several occasions, J.K. came back from visits with redness in her vaginal area. Kula explained to Suzette the redness was likely caused by a new soap. Suzette also mentioned her observations of the children's behavioral changes to Kula. He told her that he had not witnessed any problems. In October of 2014, the children were riding home with Suzette following a visit with Kula. J.K. told her mother she had a secret. She said,

3

"[Kula] put his penis on me." S.K. then told her that Kula "does the same thing to me" and made a simulated masturbation motion.

J.K. and S.K. were able to identify body parts, including the vagina and penis. Each referred to her vagina as her "pee pee." On more than one occasion Kula put his penis on J.K.'s and S.K.'s "pee pees." Each girl saw Kula's penis in his bedroom and it actually touched her "pee pee." Each time this happened in Kula's bedroom on his bed. J.K. also saw Kula go into the bedroom with either S.K. or L.R. There were occasions when J.K., S.K., or L.R. slept with Kula in his bed.

S.K. also remembers Kula taking pictures of her "pee pee" with his phone. Her legs were "out" or spread apart when he took pictures of her "pee pee." He asked her to keep some things secret. No photographs matching this description were found or offered into evidence.

Based upon the disclosures J.K. and S.K. made to their mother, Suzette contacted child protective services. After the girls were interviewed, the matter was reported to the Fayette County Sheriff. Fayette County Deputy Sheriff James Davis obtained an arrest warrant for Kula and a search warrant for Kula's rented home in Arlington. Pursuant to the search warrant, sheriff's deputies conducted a search on October 31, 2014. They immediately noticed a camera surveillance system set up both outside and inside the home. The cameras were hooked up to various recording devices. The officers discovered numerous DVDs and VHS tapes located throughout the house in duffel bags, closets and drawers. Over 200 tapes were seized.

Deputy Davis viewed all of the DVDs and VHS tapes. He discovered nude photographs and videos of L.R. changing her clothes in a bedroom in Kula's rented home. Davis knew L.R. and identified her in the tape. One of the videos shows L.R. in a bed under the covers; Kula enters the bedroom, puts his hand over the covers, rubs L.R.'s back, pulls back the covers, wipes her off with what appears to be a towel and tells her to get dressed and come eat some supper. L.R.'s father is also seen on the same video. Another video was taken from a camera that was located about one foot off of the floor in J.K. and S.K.'s bedroom. It shows L.R. changing clothes, and between several outfits she is naked. Videos also contain images of other children dressing and undressing. Davis was able to identify some of the minors as family members. However, some of the

4

other videos appear to have been taken by Kula when he lived in Grinnell, Independence, and Oelwein.

> J.K. and S.K. both testified outside of the presence of Kula via closed circuit television. L.R. testified in the courtroom with Kula present.

*Id.* at \*1–2.

Because Kula was convicted following a bench trial, our review benefits from express findings of fact and credibility. The district court directly addressed the credibility of the victims and considered the inconsistencies alleged by Kula:

> The court has reviewed all of the statements and finds that there are some differences in their statements from one interview to the next. The record as a whole, however, does not show any of the children lacked competency to be a witness. Despite the inconsistencies, J.K., S.K and L.R. each showed an independent recollection of the tangible details of the multiple sexual abuse incidents. Each of the young girls were competent witnesses whose testimony was believable despite inconsistencies. . . .
>
> As in most sex abuse cases, the primary evidence against [Kula] is the testimony of his young daughters. The court has found their testimony to be competent. It is further bolstered by testimony of [Kula]'s wife about how their behaviors changed after the alleged abuse incidents and the presence of the video equipment and tapes within the residence.

Following his direct appeal, Kula filed this PCR application alleging ineffective assistance of trial counsel. Kula deposed his trial counsel on counsel's failure to cross-examine the victims. At the PCR trial, Kula maintained that his mother and son would have testified at trial that he was never alone with the victims. The PCR court denied Kula's application, and he now appeals, also raising ineffective assistance of PCR counsel.

## II. Standard of Review.

"We review claims of ineffective assistance of counsel de novo." *King v. State*, 797 N.W.2d 565, 570 (Iowa 2011). "In conducting our de novo review, we give weight to the lower court's findings concerning witness credibility." *Id.* at 571 (cleaned up).

## III. Error Preservation.

We start with the State's position that error was not preserved on the challenges related to the CPC interviews. "It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). This doctrine applies in PCR cases as well. *Lamasters v. State*, 821 N.W.2d 856, 862 (Iowa 2012). There is an exception to the error-preservation rule when the PCR applicant argues on appeal that PCR counsel was ineffective in failing to raise the issue with the PCR court. *Goode v. State*, 920 N.W.2d 520, 526 (Iowa 2018). However, we will not review such claims if "the record on appeal is inadequate to address the new claim of ineffective assistance of postconviction counsel." *Id.* Typically, PCR counsel should be given the opportunity to "explain what issues he determined had merit to pursue postconviction." *Trott v. State*, No. 18-0624, 2019 WL 1300418, at *4 (Iowa Ct. App. Mar. 20, 2019).

We begin by addressing Kula's claim that his trial counsel was ineffective in not only failing to object to the admission of S.K.'s CPC interview, but also in requesting "that J.K. and L.R.'s interviews be admitted too." This argument is not preserved for our review. Not only did Kula fail to raise this argument below, Kula's PCR counsel expressly stated at the PCR hearing that Kula was not challenging admission of the interviews: "I don't

take issue with the videos being submitted in their entirety to the court, but what I take issue with [is trial counsel] not making any arguments based on what the videos did show." As a result, the district court did not rule on the propriety of trial counsel's decision to permit the interviews to be introduced without challenge.

Kula alternatively argues that, if we "determine[] that the issue of admitting the CPC interviews is not preserved, [PCR] counsel was ineffective for not preserving it." In his brief, Kula recognizes that "PCR counsel was aware of the [CPC exhibits] issue," yet chose to instead focus on trial counsel's failure to cross-examine the victims on the allegedly inconsistent statements they made during those interviews. But Kula does not offer a theory for why PCR counsel's chosen strategy—focusing on trial counsel's failure to cross-examine—was ineffective. And to the extent he does—vaguely claiming "[t]here are glimpses of another, likely more effective, strategy of suggesting that the claims were fabricated"—PCR counsel has not been given an opportunity to explain his chosen PCR trial strategy. The record on Kula's claim that his PCR counsel failed to challenge the CPC interviews is inadequate for our review, and his ineffective-assistance claims against his trial counsel on that issue have not been preserved.

## IV. Discussion.

On appeal, Kula argues he suffered from ineffective assistance of both trial and PCR counsel. He contends trial counsel engaged in incompetent cross-examinations and inadequately investigated potential defense witnesses. Kula additionally argues his PCR counsel was ineffective in failing to raise the issue of cumulative error by trial counsel.

7

To prove ineffective assistance of counsel, the appellant must show that "(1) counsel failed to perform an essential duty, and (2) prejudice resulted." *State v. Lane*, 726 N.W.2d 371, 393 (Iowa 2007). We presume that counsel acted competently and will not find prejudice unless "there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Hopkins*, 576 N.W.2d 374, 378 (Iowa 1998) (citation omitted).

Failure to perform an essential duty is shown by proving counsel "perform[ed] below the standard demanded of a reasonably competent attorney." *State v. Haas*, 930 N.W.2d 699, 703 (Iowa 2019) (citation omitted). We strongly presume "that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (citation omitted).

Prejudice is established by "showing that counsel's errors were so serious as to deprive the [applicant] of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). This standard requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. We "always ha[ve] the option to decide the [PCR] claim on the prejudice prong of the *Strickland* test, without deciding whether the attorney performed deficiently." *State v. Clay*, 824 N.W.2d 488, 501 n.2 (Iowa 2012).

**A. Cross Examinations.** Kula first contends that "[t]rial counsel had a duty to cross-examine" and failed to do so effectively because counsel did not cross-examine the victims about discrepancies between their trial testimony and CPC-interview statements and because the cross-examinations damaged Kula's defense. Kula's trial counsel "acknowledge[d] that it was his strategy to not depose the child witnesses as they were young,

8

and he determined it was unnecessary because they were questioned at the [CPC]" and because "the CPC videos stood on their own as inconsistent with the trial testimony." Both the State and trial counsel recognized the inconsistencies within the CPC videos as the prosecutor noted "there are so many inconsistencies in those videos that go to the credibility of these children, and that's why we are asking that if one is admitted, then for reasons of, I forget, because [L.R.] has forgot a lot of things as well, I think they should all be admitted." The PCR court found no prejudice, agreeing with trial counsel's assertion that the trial "[c]ourt would be able to see the inconsistencies and cross-examination would not add anything to the defense of the case."

Kula goes further, arguing that trial counsel's cross-examination brought out inculpatory information that made it easier to convict him, such as L.R.'s cross-examination testimony that Kula had "sex" with her, a claim not made in her CPC interview. Likewise, J.K. testified that Kula "does not have a pee-pee" like girls do because he "has a penis," and that he touched her "pee-pee." Yet, Kula admits that cross-examination did not go as trial counsel expected, with the victims making some statements inconsistent with their CPC-interview statements. And as the State observes, the "pee-pee" statements were, at worst, cumulative because it was a restatement of the victims' testimony during direct examination. We cannot conclude that it was ineffective assistance for trial counsel to ask questions he believed would elicit answers consistent with the witnesses' CPC-interviews.

While the unexpected cross-examination answers were inculpatory, those answers also highlighted inconsistencies between the CPC-interview and cross-examination responses. As a trial strategy, trial counsel avoided the opportunity for the child to explain or clean up any inconsistencies.

9

Instead, counsel let the CPC videos in and then identified the inconsistencies for the trial court in his closing argument. We cannot accept Kula's claim that "the discrepancies are at best minor and do not test credibility" when the trial court acknowledged and then directly addressed those inconsistencies in its credibility findings.

We do not find that counsel was ineffective when he received unexpected inconsistent responses from the victims during cross-examination. Further, trial counsel's failure to further question the victims on those inconsistencies out of a belief "that the CPC videos stood on their own as inconsistent with the trial testimony" was vindicated by the trial court's express recognition of the inconsistent statements. Trial counsel was not ineffective in his cross-examination. But even so, we agree with the PCR court's analysis that:

> [A]ny error committed by counsel did not result in prejudice and did not affect the outcome of the case as the trial court found the testimony of the victims competent and credible and found the presence of video equipment and tapes bolstered their testimony.

Thus, Kula failed to meet his burden on this challenge.

**B. Inadequate Investigation of Witnesses.** Kula next claims trial counsel was ineffective in failing to adequately investigate potential witnesses, specifically his mother and his son. He argues his mother would have testified that she was "present at all times" and "with him every time he had his children." As to his son, Kula contends trial "counsel did not know what [his son] would say" during testimony, addressing only the ineffective-assistance prong. Kula assumes the lack of testimony from his son prejudiced him.

Any potential testimony from Kula's mother or son claiming he was never alone with the victims would have been rebutted by the evidence presented at trial. Deputy Davis testified to the contents of the recovered video footage, describing Kula being alone in a bedroom with L.R. while she was wearing "[j]ust her underwear." Additionally, Kula's claims regarding his mother's and son's potential testimony are undermined by his trial counsel's deposition testimony, in which he stated that Kula had "admitted to masturbating in front of his two girls and telling them to keep a secret." Because the alleged prejudice is completely unsupported by the evidence in the record, and is otherwise only supported by Kula's self-serving claims, we find no prejudice resulting from trial counsel's purported failure to investigate potential witnesses.

**C. Cumulative Error.** Kula lastly raises a claim of ineffective assistance of PCR counsel for his PCR counsel's failure to raise the issue of cumulative error by trial counsel. "Having found each of the underlying claims to have no merit individually, we reject the claim of cumulative error." *State v. Artzer*, 609 N.W.2d 526, 532 (Iowa 2000).

We thus affirm the PCR court's denial of Kula's application for postconviction relief.

**AFFIRMED.**

11