# IN THE COURT OF APPEALS OF IOWA

No. 19-1815
Filed April 28, 2021

**BRANDON BROWN,**
    Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
    Respondent-Appellee.
_____

Appeal from the Iowa District Court for Johnson County, Lars Anderson, Judge.

Brandon Brown appeals dismissal of his postconviction-relief action. **AFFIRMED.**

Mark C. Meyer, Cedar Rapids, for appellant.

Thomas J. Miller, Attorney General, and Sheryl Soich, Assistant Attorney General, for appellee State.

Considered by Mullins, P.J., and May and Schumacher, JJ.

**MAY, Judge.**

Brandon Brown appeals the dismissal of his postconviction-relief (PCR) action. We affirm.

**I. Factual Background**

Two eye witnesses told police that Brown shot Donelle Lindsey several times. The State charged Brown with Lindsey's murder. A jury found Brown guilty of murder in the first degree.

Brown appealed. Our court affirmed. *State v. Brown*, No. 14-0066, 2015 WL 2393441, at *8 (Iowa Ct. App. May 20, 2015). Our opinion included this summary of the record:

> On June 21, 2012, DiMarco Harris spent the day drinking with Donelle Lindsey at Harris's apartment on Petsel Road in Iowa City. Harris testified he had just been released from prison and was on parole. They met between 11:00 a.m. and 12:00 p.m. and drank until around 7:00 pm. On two occasions, Lindsey left the apartment to talk on his telephone. At around 7:00 p.m., Lindsey told Harris he was going to leave to "meet [his] ride" and would call later. Thirty minutes later, Lindsey returned, eager to spend more time with Harris. Sometime around 9:00 or 10:00 p.m., Lindsey arranged for a friend to come pick him up. Harris testified that although they had been drinking, they were not inebriated.
>
> Harris testified he and Lindsey were waiting outside and talking. Brandon Brown and Byron Fisher approached them. Harris knew Fisher was his downstairs neighbor but did not know Brown. Fisher greeted Harris and shook his hand. Brown addressed Lindsey by a nickname and asked to talk to him. Brown and Lindsey walked off together toward the side of the apartment building. Harris continued talking with Fisher. At one point, Fisher said to Brown and Lindsey, "You all better cut that shit out." Harris then saw Brown reveal a gun and shoot Lindsey. He thought there were four shots. Brown ran off toward the back of the building and to the north. Lindsey walked back to where Fisher and Harris were standing. Harris could not tell how badly Lindsey was injured but could see he was bleeding. Fisher left and went back into the apartment building. Harris ran after Fisher asking, "Who was that dude?" Fisher was crying and unable to speak. Harris went into his apartment and stayed there. His girlfriend had already called 911. He did not return

to the scene when police officers arrived because he had just been released from jail, he was on parole, and had been drinking.

Fisher testified that he was at his apartment when Brown came over at about 6:00 or 7:00 p.m. that evening. He had known Brown for seven or eight months. Fisher and Brown drank together for a couple of hours. While walking to Fisher's apartment building, they observed Lindsey and several other people hanging out outside. Fisher testified he and Brown decided to walk to a nearby gas station, but Brown stopped to speak with Lindsey. The conversation was hostile on both sides with Brown stating something like, "[Lindsey] can't fight or [Brown] will whup his ass." Fisher testified Brown walked away in anger, then returned a few minutes later with a gun in his hand, held low by his side. He pulled Lindsey away from the main gathering, and said something like, "What was that shit you was just talking." Lindsey did not respond. Fisher testified Brown then pointed the gun at Lindsey from a couple feet away and shot him four times in rapid succession. Lindsey took a few steps, then fell and did not move. Fisher went into his apartment and remained there. He testified he did not contact police when they arrived on the scene because he did not want anything to do with the incident. Both Harris and Fisher lied when initially interviewed by law enforcement officers, but later told what happened and testified at trial. Upon seeing a line-up of suspects in the shooting, Harris initially narrowed the options down to two men.

Nicole Blosser was living with her boyfriend, Ivan Hardemon, in a nearby apartment complex. Hardemon was Brown's cousin. She and Hardemon were standing outside her apartment on the evening of June 21 when they heard gunshots. They ran into the apartment. Hardemon got a telephone call on his cell phone, went downstairs, then came back up with Brown. Hardemon and Brown went into a back room and talked for a few minutes. They then came out, and Hardemon told Blosser they all had to go. Blosser, Hardemon, and Brown took her car and drove to Chicago. Brown stated he had shot a man. They dropped Brown off at an apartment building in Chicago, turned around and drove straight back to Iowa City. In the car on the way back, Hardemon instructed Blosser not to discuss the event with anyone. Once back in Iowa City, Hardemon got a phone call from Brown's girlfriend, who lived a few buildings over. Hardemon and Blosser drove over to the girlfriend's apartment. The girlfriend gave them a shoe box containing two handguns. They then drove to the home of Brett and Kathy Kriz and handed Brett the box. Brett and Hardemon went into a back room for a few minutes and returned. Later, law enforcement officers interviewed Blosser at her apartment. At first she did not cooperate, because she was scared and did not want to be involved, but later gave full answers. At the time of the incident, Hardemon was present in Iowa in violation of his parole and, as a felon, could not possess firearms.

Brett Kriz was subpoenaed to testify but refused to answer most questions, citing his Fifth Amendment right against self-incrimination. Law enforcement officers executed a search of his home but found nothing relevant to the shooting. The medical examiner testified Lindsey suffered five gunshot wounds. At least one bullet went through Lindsey's heart and death would have followed shortly afterward as a result. Two of the wounds would have been fatal individually.

*Id.* at *1–2 (alterations in original) (footnotes omitted).

Procedendo issued on July 10, 2015. About a year and a half later, in February 2017, Brown filed the present PCR action. In October 2019, the court entered an order denying relief. The court rejected Brown's claims that trial counsel had been ineffective in (1) failing to convey an alleged time limitation on a plea offer; (2) not seeking to move venue of his trial out of Johnson County; (3) failing to investigate and introduce certain evidence; (4) advising Brown not to testify; and (5) inviting and not objecting to certain testimony of Nicole Blosser. This appeal follows.

## II. Standard of Review

"We review claims of ineffective assistance of counsel de novo." *King v. State*, 797 N.W.2d 565, 570 (Iowa 2011). "In conducting our de novo review, 'we give weight to the lower court's findings concerning witness credibility.'" *Id.* at 571 (citation omitted).

"To establish [a] claim of ineffective assistance of counsel, [the applicant] must show [their] trial counsel failed to perform an essential duty and counsel's failure resulted in constitutional prejudice." *State v. Walker*, 935 N.W.2d 874, 881 (Iowa 2019). "The claimant must prove both elements by a preponderance of the evidence." *State v. Madsen*, 813 N.W.2d 714, 724 (Iowa 2012).

To establish breach of an essential duty, the claimant must prove counsel "perform[ed] below the standard demanded of a reasonably competent attorney." *State v. Haas*, 930 N.W.2d 699, 703 (Iowa 2019) (citation omitted). "In analyzing the [applicants]'s claims, we 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . .'" *Id.* (citation omitted). So the applicant "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (citation omitted).

"To establish constitutional prejudice, the [applicant] is required to show 'that counsel's errors were so serious as to deprive the [applicant] of a fair trial, a trial whose result is reliable.'" *Walker*, 935 N.W.2d at 881 (citation omitted). "It is not enough for the [applicant] to show that the errors had [only] some . . . effect on the outcome of the proceeding." *Id.* (second alteration and omission in original) (citation omitted). "Rather, '[t]he [applicant] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (first alteration in original) (citation omitted).

When the applicant fails to show constitutional prejudice, it is not necessary for the court to decide whether counsel breached a duty. *See id.*; *King*, 797 N.W.2d at 574 ("In this case, however, it is not necessary to decide the issue of whether King's counsel provided inadequate assistance because, upon our review of the entire record, we conclude that King has failed to show prejudice as required under the *Strickland* [*v. Washington*, 466 U.S. 668 (1984)] test.").

**III. Analysis**

In this appeal, Brown claims the PCR court erred in failing to find trial counsel was ineffective by (1) not presenting evidence that police altered a recording of an interview in which police may have used a racial epithet to refer to Brown; and (2) opening the door for witness Blosser to testify that her now-deceased boyfriend told her he could not protect her if she became involved in the investigation of Lindsey's murder. Brown also claims PCR counsel was ineffective in failing to raise three additional theories. We begin with his claims of error by the PCR court.

**A. Claims of error by the PCR court**

**1. The recording**

Brown claims the PCR court should have found trial counsel was ineffective in failing to offer evidence that police might have altered a recording of an interview. We disagree.

As trial approached, Brown's counsel requested discovery from the State. The State permitted defense counsel to bring an external hard drive to the police station and download all of the State's documents and recordings. This included a video recording of an interview of Ivan Hardemon by police detective Gonzales. While reviewing the recording, one of Brown's attorneys thought she heard Gonzales use a racial epithet to describe Brown. Counsel noted the issue.

Later, counsel learned that additional discovery was available. Counsel then took the same hard drive back to the police station to obtain the additional materials. As counsel explained to the PCR court, this process "erased the

discovery that was on . . . the drive and put everything back on again, including the additional discovery."

When counsel later reviewed the Hardemon interview again, she could not hear the racial epithet. It seemed "like it was a different word," maybe "dude," "in its place."

So counsel found a forensic expert, Jerry Hatchett, to evaluate whether the recording had been altered. At first, Hatchett expressed a "VERY preliminary" sense that the recording seemed "fishy." After completing his analysis, though, Hatchett's opinion changed. He told counsel he had gone through the recording "in excruciating detail" but "there's just nothing there to suggest an edit." Hatchett advised that while additional testing was possible, he did not "expect it to yield anything different." In short, as counsel explained at the PCR trial, Hatchett simply "did not believe" the recording "had been edited or altered."

But Hatchett also told counsel that, when the current copy was made, "they had the record levels set too high, resulting in terrible quality, much distortion, etc." Hatchett believed that counsel "could've heard an earlier copy that was far clearer."

Brown now claims that, although counsel could not have shown purposeful erasure of the possible racial epithet, counsel could have used Hatchett to show the second recording was not as clear as the first. Brown contends this would have cast doubt on the "integrity of the investigation." Counsel was ineffective for failing to do so, Brown contends.

We disagree. When trial counsel makes strategic decisions after thorough investigation and consideration, those decisions are "virtually unchallengeable." *Strickland v. Washington*, 466 U.S. 668, 690 (1984). Like the State, we think

counsel exercised due diligence by retaining Hatchett and exploring the question of whether police had engaged in wrongdoing. From our review, though, the inquiry revealed no smoking gun that would have (1) shown police certainly used a racial epithet or (2) certainly created doubts in the jury's minds about the "integrity of the investigation." Moreover, as counsel explained during PCR testimony, raising these issues at trial was not a risk-free proposition. Rather, counsel was concerned the jury might consider these issues to be "red herrings" and then "hold that against [the defense's] credibility in some way." We do not think counsel violated professional norms by concluding these risks were, in counsel's words, "too big . . . to take." *See Haas*, 930 N.W.2d at 703 ("In analyzing the defendant's claims, we must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." (internal quotation marks and citation omitted)).

In any event, Brown has not demonstrated constitutional prejudice. Two eyewitnesses testified that Brown shot Lindsey at least four times at close range. The jury heard Brown's admission that he had "shot somebody" through the testimony of Blosser. And the jury heard Brown fled to Chicago on the night of the shooting. As we observed in Brown's direct appeal, "[t]he weight of the evidence . . . heavily support[ed] the jury's guilty verdict." *Brown*, 2015 WL 2393441, at *7. Given the State's formidable case against Brown, we see no "reasonable probability that . . . the result of the proceeding would have been different" if

Brown's counsel had offered the available evidence on this issue. *See Strickland*, 466 U.S. at 694.

### 2. Blosser cross-examination

Brown next complains counsel was ineffective in asking certain questions of Blosser on cross-examination. We disagree.

As noted, Blosser was an important witness for the State. She testified that she and Hardemon took Brown across state lines to Chicago after the shooting. More importantly, she told the jury that, during the trip, Brown admitted he shot somebody.

On cross-examination, though, the defense was able to demonstrate that Blosser was not always truthful in her discussions with police. She admitted she had sometimes denied any knowledge of the shootings.

Counsel also asked about Blosser's conversations with Hardemon during the trip back from Chicago. Brown draws our attention to this portion of the testimony:

> Q: What conversation was had when you dropped him off, was it just see ya, you guys turned around and came back to Iowa City? A: Yes.
> Q: Any conversation you and [Hardemon] had on the way back from Iowa City? A: Don't talk about it, don't tell the police.
> Q: I'm sorry? A: Don't talk about it, don't tell anybody.
> Q: [Hardemon] told you don't say anything to anyone? A: Yes.

Brown claims these questions created an "opportunity" that the State "seiz[ed]" on re-direct. Brown focuses on this portion of the State's questioning:

> Q: When did [Hardemon] begin telling you not to tell anybody, not to cooperate about this case? A. On the ride home.
> Q: In what kind of terms did he put that? A: I can't help you if you talk.

Q: How did that make you feel?  A: That I shouldn't talk, scared.
Q: That's what I'm looking for, did you have an emotional reaction to that?  A: Yes.
Q: Does that remain?  A: Yes.
Q: Why would the father of your children, if you know, say that to you?  A: Because he didn't want me to get hurt.

Before the PCR court, Brown argued "[t]he State could not have gotten any of this useful evidence . . . on its own from direct testimony because what [Hardemon] allegedly told [Blosser] was clearly hearsay."  But, Brown complained, counsel's questions about Blosser's conversation with Hardemon "opened the door" for the State to elicit this testimony on re-direct.  "In doing so," Brown contended, counsel "failed to perform an essential duty [of] not handing the State a great explanation" for Blosser's "credibility issues."

The PCR court believed Brown's complaint was about hearsay.  The court described Brown's complaint as follows: "Brown claims that trial counsel erred by opening the door to allow the otherwise inadmissible hearsay testimony of Blosser on re-direct."  The court did not believe this claim was meritorious.  The court concluded Blosser's testimony was not hearsay because it was offered "not to show the truth of the matter asserted but to explain responsive conduct," namely, inconsistency in Blosser's statements.  And so, in the court's view, no breach of duty occurred.

On appeal, Brown does not contest the PCR court's ruling on the hearsay issue.  Instead, Brown raises purely tactical criticisms about counsel's choice of cross-examination questions.  Brown notes that, at the PCR trial, defense counsel "did not give an explanation" as to how counsel "expected it would benefit Brown to ask Blosser about her conversation with Hardemon."  In fact, Brown argues,

counsel's questions to Blosser were damaging because they "opened the door" for the State to elicit from Blosser "her explanation for not being forthcoming and apparently lying about having no knowledge about the murder." All told, Brown believes there was nothing to gain and much to lose from asking Blosser about her conversations with Hardemon. Therefore, Brown argues, counsel's cross-examination amounted to a breach of professional duties.[1]

We disagree. As counsel explained at the PCR trial, portraying Hardemon as a villain played into their defense: "[T]he theory of the case was that [Hardemon] was responsible [for Lindsey's murder], and our theory was that if [Hardemon] is threatening [Blosser] not to talk, that leads into our . . . theory that he's threatening her not to talk about his involvement in the case." While the "blame Hardemon" gambit did not ultimately win an acquittal, we cannot say it was unreasonable under the circumstances. Certainly Brown has not "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *See Haas*, 930 N.W.2d at 703 (citation omitted). So Brown has not met his burden of showing PCR counsel was ineffective.

---

[1] We note it does not appear the PCR court ruled on Brown's current argument that counsel breached professional duties by asking questions that were "ill-advised" from a tactical perspective. Rather, it appears the PCR court only ruled on Brown's argument that counsel breached professional duties by eliciting and opening the door for *hearsay*. So we question whether error was preserved on Brown's current argument. *See Lamasters v. State*, 821 N.W.2d 856, 862 (Iowa 2012) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." (citation omitted)). But we note that, as part of its *prejudice* analysis, the district court addressed Brown's complaint that counsel's questions helped the State explain "that Blosser was afraid and this explains why she lied to the police initially." We assume without deciding this was sufficient to preserve Brown's current argument.

**B. Ineffective assistance of PCR counsel**

In addition to his claims of error by the PCR court, Brown also contends we should address his arguments that PCR counsel was ineffective in failing to argue that trial counsel was ineffective in (1) failing to obtain and examine the original audio recording of the interview of Hardemon; (2) failing to object to certain "vouching" testimony by Detective Gonzales; and (3) failing to object to the prosecutor's remarks about included offenses during closing argument. We address each below.

**1. New claim about the Hardemon interview**

Brown concedes the present record is insufficient for us to review his new claim about Hardemon's interview. We accept his concession. The real question is what to do next. Ordinarily, we would preserve Brown's claim for a separate action. But Brown asks us to remand for further proceedings instead. Brown acknowledges the supreme court's decision in *Goode v. State*, which made clear that we should not "remand claims of ineffective assistance of postconviction counsel raised for the first time on appeal to the district court to hear and decide." 920 N.W.2d 520, 527 (Iowa 2018); *see also Taylor v. State*, No. 19-1175, 2020 WL 4814119, at *2 (Iowa Ct. App. Aug. 19, 2020) (declining request for remand and relying on *Goode*); *Lusk v. State*, No. 18-1125, 2019 WL 1953461, at *2 (Iowa Ct. App. May 1, 2019) (same). In Brown's view, though, subsequent developments—particularly, the legislature's recent amendment of Iowa Code section 822.3 (2019)—cast doubt on *Goode*'s validity. *See* 2019 Iowa Acts ch. 140, § 34. *But see Goode*, 920 N.W.2d at 527 ("The request made on appeal to remand the case to the postconviction court fails not because of the statute of

limitations governing claims of ineffective assistance of counsel, but the rules governing our appellate process.").

We cannot adopt Brown's position. "[T]he Iowa Court of Appeals must follow the legal precedents of the Iowa Supreme Court." *In re Estate of O'Banion*, No. 19-0485, 2020 WL 567271, at *1 (Iowa Ct. App. Feb. 5, 2020) (citation omitted); *see also McGee v. State*, No. 19-1335, 2020 WL 5650470, at *4 (Iowa Ct. App. Sept. 23, 2020) ("Any new exceptions [to the prejudice requirement in PCRs] should be recognized first by the supreme court, not this intermediate court."); *Purvis v. State*, No. 18-2001, 2020 WL 4497383, at *3 n.1 (Iowa Ct. App. Aug. 5, 2020) ("Purvis suggests Iowa should adopt different standards for prejudice. But the standards explained above come directly from our supreme court. Any changes to those standards may not come from this intermediate court of appeals."); *In re T.W.*, No. 20-0145, 2020 WL 1881115, at *1 (Iowa Ct. App. Apr. 15, 2020) (noting the supreme court's statutory interpretation is "binding on this intermediate appellate court"). So, consistent with *Goode*, we decline Brown's request to remand. *See* 920 N.W.2d at 527. Instead, we preserve his new argument about the Hardemon interview for possible future litigation.

**2. The other new claims**

We turn now to Brown's other new ineffective-assistance claims. As to these claims, the parties agree the record is sufficient for our review.[2] Before

---

[2] We accept this agreement because, as will be explained, the current record is sufficient to determine that Brown's claims are *not* meritorious. If we believed Brown's claims *could* have merit, however, the current record would *not* permit us to grant relief and would instead require us to preserve Brown's claims for a future PCR proceeding. This is because both of Brown's claims concern the decision-making processes of Brown's prior lawyers. And our record does not include

reaching their merits, though, we consider the State's argument concerning section 822.3.

Section 822.3 requires every PCR proceeding to be "commenced by filing an application." In general, the "application[] must be filed within three years from the date the conviction or decision is final or, in the event of an appeal, from the date the writ of procedendo is issued." Iowa Code § 822.3.

In *Dible v. State*, our supreme court held that ineffective assistance by PCR counsel action did not excuse the untimely filing of a second PCR application. 557 N.W.2d 881, 883 (Iowa 1996), *abrogated in part by Harrington v. State*, 659 N.W.2d 509 (Iowa 2003). Later, in *Allison v. State*, our supreme court "qualif[ied] *Dible*" and held:

> [W]here a PCR petition alleging ineffective assistance of trial counsel has been timely filed per section 822.3 and there is *a successive PCR petition* alleging postconviction counsel was ineffective in presenting the ineffective-assistance-of-trial-counsel claim, the timing of the filing of *the second PCR petition* relates back to the timing of the filing of the original PCR petition for purposes of Iowa Code section 822.3 if *the successive PCR petition* is filed promptly after the conclusion of the first PCR action.

---

testimony from trial counsel about why counsel made the decisions of which Brown complains. Nor does our record include testimony from PCR counsel as to why these issues were not raised before the PCR court. So the current record does not allow us to say whether counsel's actions could be explained as "a trial tactic or strategy." *See State v. Tompkins*, 859 N.W.2d 631, 643 (Iowa 2015). Accordingly, based on the current record, we could not conclude counsel's decisions "fell below the standard of a reasonably competent practitioner, such that counsel failed to perform an essential duty." *Id.*; *accord Trott v. State*, No. 18-0624, 2019 WL 1300418, at *4 (Iowa Ct. App. Mar. 20, 2019) (concluding claim "should be preserved for a further postconviction proceeding, where PCR counsel may explain what issues he determined had merit to pursue postconviction"); *see also State v. Coil*, 264 N.W.2d 293, 296 (Iowa 1978) ("Even a lawyer is entitled to his [or her] day in court, especially when his [or her] professional reputation is impugned.").

914 N.W.2d 866, 890–91 (Iowa 2018) (emphasis added).

Then, in 2019, the legislature amended section 822.3, apparently in response to *Allison*. The amendment added these words: "An allegation of ineffective assistance of counsel in a prior case under this chapter shall not toll or extend the limitation periods in this section nor shall such claim relate back to a prior filing to avoid the application of the limitation periods." 2019 Iowa Acts ch. 140, § 34 (codified at Iowa Code § 822.3 (Supp. 2019)).

In the State's view, this amendment reflects the legislature's choice "to restore the law to its pre-*Allison*, *Dible* roots." "The State urges that th[is] anti-*Allison* provision squarely applies to Brown" and bars our consideration of his claims of ineffective-assistance by PCR counsel.

We reach a different conclusion. *Dible* and *Allison* both involved "second" or "successive" PCR applications that were filed outside the three-year limitation period. *See Dible*, 557 N.W.2d at 882; *see also Allison*, 914 N.W.2d at 871. Similarly, the 2019 amendment only applies to second or subsequent PCR cases. *See* Iowa Code § 822.3. According to the words chosen by our legislature, the amendment only governs "allegation[s] of ineffective assistance of counsel *in a prior case* under this chapter," that is, in a *prior* PCR case.[3] *Id.* (emphasis added). By definition, allegations about what happened "in a *prior* case" can only be brought in a second or subsequent case, not a first case. *See id.* (emphasis

---

[3] In full, the amendment states: "An allegation of ineffective assistance of counsel *in a prior case* under this chapter shall not toll or extend the limitation periods in this section nor shall *such claim* relate back to a prior filing to avoid the application of the limitation periods." Iowa Code § 822.3 (emphasis added). We think "such claim[s]" must refer back to "allegation[s] of ineffective assistance of counsel in a prior case under this chapter." *See id.*

added); *see also Maguire v. Fulton*, 179 N.W.2d 508, 510 (Iowa 1970) ("Effect must be given, if possible, to every word, clause and sentence of a statute."); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012) ("If possible, every word and every provision is to be given effect . . . . None should be ignored.  None should needlessly be given an interpretation that causes it . . . to have no consequence.").

But Brown has had no "prior" PCR case.  This is his first PCR case—and his application was filed within the three-year period.  So the authorities relied on by the State do not address Brown's situation.  Therefore, based on the current record and briefing, we cannot conclude Brown's new claims are time-barred.[4]  We turn to their merits.

*a. Testimony of Detective Gonzales*

Brown claims that Detective Gonzales was permitted to "vouch" for the credibility of Harris, Fisher, and Blosser.  So, in Brown's view: (1) trial counsel was ineffective in failing to object to Gonzales's "vouching"; and (2) PCR counsel was ineffective for failing to raise the "vouching" issue in the current PCR action.  We disagree.

To be sure, Harris, Fisher, and Blosser were all important witnesses for the State.  All three implicated Brown in the shooting.  As Brown notes, though, each

---

[4] We need not, and do not, address the question of whether a future second PCR action regarding the Hardemon interview would be barred by section 822.3.  The issue is not "ripe"; it is not an "actual, present controversy" before us; it is "hypothetical or speculative" at this stage; and our answer would constitute an improper "advisory opinion."  *In re Det. of Babcock*, No. 08-1644, 2009 WL 2392057, at *2 (Iowa Ct. App. Aug. 6, 2009) (quoting *State v. Iowa Dist. Ct.*, 616 N.W.2d 575, 578 (Iowa 2000)).

was "subject to impeachment" on several grounds "including that Harris and Fisher originally avoided the police" and "that Harris and Blosser [did] not implicate Brown when they were located and first interviewed." But the State "rehabilitated these witnesses," Brown claims, by eliciting the following testimony from Detective Gonzales:

> Q. Was it surprising that DiMarco Harris was difficult to locate? A. No.
>
> Q. Is it surprising that any witnesses in general can be difficult to locate? A. No.
>
> Q. Tell me about your experience in dealing with witnesses to violent crimes and their level of cooperation and attitude towards the investigation? A. It's not uncommon for, in my experience, for probably one major reason that stands out more than any other. That's because it's not uncommon for those witnesses not to be witnesses, necessarily they don't want to be a witness in a violent crime, and this particular case that rings true.
>
> Q. Do you see that manifest itself in the completeness or veracity of statements given to officers over time? A. Yes.
>
> Q. Could you elaborate on that? A. Because certain witnesses would prefer not to be witnesses when we do interviews, when I say we, I mean the police, do interviews, it's not uncommon to have to maybe extract information from a witness, to get to the truth of what happened or what they saw. That unfortunately is a common occurrence.

According to Brown, these statements amounted to improper "vouching" in violation of the supreme court's edicts in *State v. Brown*, 856 N.W.2d 685, 688 (Iowa 2014),[5] *as amended* (Feb. 23, 2015), *State v. Dudley*, 856 N.W.2d 668, 677

---

[5] In *Brown*, the court found an expert impermissibly vouched for a child by stating the child's "disclosure" of abuse was "significant and that an investigation is clearly warranted." 856 N.W.2d at 688.

(Iowa 2014),[6] and *State v. Jaquez*, 856 N.W.2d 663, 665 (Iowa 2014).[7] We disagree. In *Brown*, *Dudley*, and *Jaquez*, "an expert directly or indirectly vouche[d] for a witness's credibility thereby commenting on a defendant's guilt or innocence." *See Jaquez*, 856 N.W.2d at 665. That is not what occurred here. Gonzales discussed the widely-understood fact that most people would rather not get involved in the investigation of violent crimes. *Cf. State v. Purk*, No. 18-0208, 2019 WL 5790875, at *5 (Iowa Ct. App. Nov. 6, 2019) (noting "the dangers faced by informants, who are sometimes referred to as 'snitches,' and who sometimes end up in 'ditches'"). While Gonzales noted that this observation "rings true" in "this particular case," he was no more specific. He did not address the veracity—or lack thereof—of any particular allegation or any particular witness. So we believe *Brown*, *Dudley*, and *Jaquez* are distinguishable. Trial counsel had no duty to object, and PCR counsel had no duty to raise the issue. This claim fails. *See State v. Lorenzo Baltazar*, 935 N.W.2d 862, 868 (Iowa 2019) (noting "[f]ailure to prove either [the duty or prejudice] prong is fatal to an ineffective-assistance-of-counsel claim").

### b. Argument about lesser-included offenses

Finally, we address Brown's new claim about the prosecutor's comments about the jury instructions during closing arguments. The jury was instructed on murder in the first degree as well as several included offenses such as murder in

---

[6] In *Dudley*, the court found an expert impermissibly vouched for a child by opining "she believed" that the defendant had "sexually abused" a child, as the child claimed. 856 N.W.2d at 678.

[7] In *Jaquez*, the court found an expert impermissibly vouched by opining that a child's demeanor was "completely consistent with a child who has been traumatized, particularly multiple times." 856 N.W.2d at 665.

the second degree, voluntary manslaughter, and so on. The marshalling instruction for murder in the first degree stated:

> The State has charged the defendant with murder in the first degree with premeditation, willfulness, and deliberation. The State must prove all the following elements as set forth below:
> 1. On or about the 21st day of June 2012, Brandon Brown intentionally shot Donelle Lindsey.
> 2. Donelle Lindsey died as a result of being shot.
> 3. Brandon Brown acted with malice aforethought.
> 4. Brandon Brown acted willfully, deliberately, premeditatedly and with a specific intent to kill Donelle Lindsey.
> If the State has proved all of the elements, the defendant is guilty of murder in the first degree with premeditation, willfulness and deliberation. If the State has failed to prove any one of the elements, the defendant is not guilty of murder in the first degree with premeditation, willfulness and deliberation; and you will then consider the charge of murder in the second degree explained in the next instruction.

Each of the included offense instructions was structured similarly, although with different elements required. For instance, the instruction for murder in the second degree stated:

> The State must prove all of the following elements of murder in the second degree:
> 1. On or about the 21st day of June 2012, Brandon Brown intentionally shot Donelle Lindsey.
> 2. Donelle Lindsey died as a result of being shot.
> 3. Brandon Brown acted with malice aforethought.
> If the State has proved all of the elements, the defendant is guilty of murder in the second degree. If the State has failed to prove any one of the elements, the defendant is not guilty of murder in the second degree and you will then consider the charge of attempt to commit murder as explained in the next instruction.

In closing argument, the prosecutor walked the jury through the "staircase" of offenses charged: murder in the first degree, murder in the second degree, and so on. Brown draws our attention to these comments in particular:

> You noticed when the Judge read these instructions that we started with murder in the first degree, that's what you were promised

at the beginning of this trial, but then she kept going and going and going, down a stair step, staircase of lesser included offenses. That's the legal concept going on here.

. . . .

We work our way down the staircase, if you need to. As you notice at the end of each marshalling instruction, the jury is told that if you find the State proved all of those elements, you will find the defendant guilty of that charge and you're done. If you find the defendant not guilty of that charge, then you move down the next level down that staircase and they are laid out in the order in which you will examine them.

You will only examine one if you decide that the defendant is guilty of murder in the first degree.

Brown contends these comments imposed an "acquittal-first" requirement, that is, a requirement that all twelve jurors agree to an acquittal on murder in the first degree before moving on to consider the next offense. *See State v. Ambrose*, 861 N.W.2d 550, 555 (Iowa 2015). But we agree with the State that the prosecutor's comments were merely "a shorthand way of characterizing" the actual text of the instructions given, which was: "If the State has failed to prove any one of the elements, the defendant is not guilty . . . ." So we do not think trial counsel had a duty to object to the prosecutor's comments.

Nor do we believe Brown has shown prejudice. Importantly, Brown raises no complaint about the jury instructions. Rather, Brown complains only about the prosecutor's comments. But the prosecutor told the jury that "if my language is not perfectly in line with what your instructions are, obviously go on the instruction." And even without that proviso, we presume the jury followed the instructions *as given*—not as a lawyer characterized them. *State v. Ondayog*, 722 N.W.2d 778, 785 n.2 (Iowa 2006) ("A jury is presumed to follow the instructions of the court.").

Moreover, because the jury found the State proved all of the elements of murder in the first degree, we do not believe comments about included offenses

could have prejudiced Brown. So Brown's claim about closing arguments cannot prevail. *See Lorenzo Baltazar*, 935 N.W.2d at 868 (noting "[f]ailure to prove either [the duty or prejudice] prong is fatal to an ineffective-assistance-of-counsel claim").

**IV. Conclusion**

We conclude: (1) the PCR court did not err in declining relief; (2) Brown is not entitled to relief based on his new claims concerning Detective Gonzales's testimony; (3) Brown is not entitled to relief based on his new claim concerning the prosecutor's arguments; (4) the record is not sufficiently developed to reach Brown's new claim about Hardemon's interview; (5) pursuant to *Goode*, 920 N.W.2d at 527, we decline Brown's request to remand the case for further development of his new claim about Hardemon's interview; and (6) consistent with *Goode*, we preserve Brown's new claim about Hardemon's interview for possible future litigation.

**AFFIRMED.**